Filed 7/20/26; certified for publication 8/11/26 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| CECILIA GODSHALL et al., | D086572 |
| Plaintiffs and Appellants, | (Super. Ct. No. 37-2022-00029915-CU-MM-CTL) |
| v. | |
| DREW A. PETERSON et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of San Diego County, Marcella O. McLaughlin, Judge.  Reversed.

Denning Morres, Jennifer S. Hegemier for Plaintiffs and Appellants.

Schmid & Voiles, Denise H. Greer, Kyle A. Cruse, and Catherine M. Schroeder for Defendants and Respondents.

In this medical malpractice action, Cecilia Godshall alleges Drew A. Peterson, M.D. and California Orthopaedic Institute Medical Associates, Inc. (Orthopaedic Institute) negligently performed carpal tunnel surgery on her in 2017.  The trial court granted summary judgment for the defendants on the ground that Godshall's complaint is barred by the statute of limitations set

forth in Code of Civil Procedure, section 340.5.[1] We conclude triable issues of material fact remain as to the date of Godshall's injury and, accordingly, reverse the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Evidence in the summary judgment record establishes the following facts. Godshall is an office support technician with the Federal Bureau of Investigation (FBI) whose job involved substantial typing duties. On October 28, 2016, she visited Dr. Peterson for an initial consultation for carpal tunnel syndrome. At her visit, Godshall reported that for five to six weeks she had been experiencing numbness and tingling in her right hand that increased with grasping, gripping and repetitive use. Godshall also reported she had a history of carpal tunnel syndrome in 2012 that resolved on its own. After an examination, Dr. Peterson diagnosed Godshall with "[p]robable recurrent right carpal tunnel syndrome." Dr. Peterson administered a corticosteroid injection and directed Godshall to return if her symptoms did not resolve in three to four weeks.

When her symptoms did not resolve, Godshall had another consultation with Dr. Peterson and he referred her for an electrodiagnostic study. The radiologist who performed the study reported Godshall had "moderate severe carpal tunnel syndrome" in her right wrist and "mild to moderate carpal tunnel syndrome" on the left side. After receiving the radiologist's report, Dr. Peterson recommended carpal tunnel release surgery. He performed the operation on January 30, 2017. Dr. Peterson's report of the operation

---

[1]     Subsequent undesignated statutory references are to the Code of Civil Procedure.

indicated he made an incision to the transverse carpal ligament, resulting in a "complete release [of] the median nerve."

At her follow up appointment two weeks after surgery, Godshall reported no change in her symptoms, but Dr. Peterson reported "good healing" and "good range of motion." He referred Godshall to occupational therapy and ordered her to return for a follow-up visit with him in six weeks. Dr. Peterson also advised Godshall she could return to work, but she should take frequent breaks from typing and should consider using a brace. Two weeks later, Godshall returned to Dr. Peterson with complaints that her incision was warm and tender. He reported after the visit that Godshall's surgical wound was well-healed, she had good sensation in all digits, and good range of motion. Dr. Peterson reassured Godshall there were no signs of infection and requested that she follow up in six weeks.

When Godshall returned for her follow-up visit on April 25, 2017, she reported "an 'ache' up to her right mid-forearm," "a 'tightness' in the joint," and concerns about "her right forearm muscle fatigue pain with repetitive typing." Godshall also told Dr. Peterson she did not have numbness or tingling and was otherwise "doing well." Dr. Peterson recommended six physical therapy sessions for her right forearm and noted that she would "return in late summer to consider scheduling of left carpal tunnel release in the fall."

On May 3, 2017, Godshall's occupational therapist reported that Godshall thought her "carpal tunnel was 'creeping back up.' " Godshall also reported "grip and pinch strength limitations" and that "grasping and twisting tasks remain[ed] challenging." The therapist advised her to continue with occupational therapy. On June 21, 2017, the therapist reported Godshall had completed 12 sessions and "demonstrate[d] no pain or

3

paresthesia, and functional [range of motion] and strength. Her scar is flat and well healed. She has minimal functional limitations and is working full duty." The therapist recommended a discharge from occupational therapy.

On June 23, 2017, Godshall contacted Dr. Peterson's office and asked him to provide a note restricting her typing activity at work for a large project because she was unable to type for long periods of time. On June 26, 2017, Dr. Peterson provided a note restricting Godshall to typing for 30 minutes per one hour period. Around this time, Godshall recalled Dr. Peterson telling her that the symptoms she continued experiencing after the operation were normal and that the surgery was successful. She remembered Dr. Peterson saying, "look, I can do 25 pushups but I cannot do a sit up to save my life because I have a bad back, just like you have a bad hand."

Almost four years later, on April 29, 2021, Godshall sought treatment from another physician, Eric Hofmeister, M.D., because the symptoms in her right hand had worsened, including numbness and her long finger locking in the flexed position. The visit was authorized by the U.S. Department of Labor through Godshall's employment with the FBI. Dr. Hofmeister ordered an ultrasound, which showed the distal transverse ligament, supposedly released during the prior operation, was still intact.

On July 12, 2021, Godshall met with Dr. Hofmeister and he informed her there was the "possibility that she had incomplete release of her transverse carpal ligament from her previous surgery in 2017." Godshall told Dr. Hofmeister that after the operation, she did not have complete resolution of her symptoms and that her symptoms had worsened in the past few months. Dr. Hofmeister recommended a "revision right carpal tunnel release" and this second operation was performed on August 17, 2021.

4

On April 28, 2022, Godshall and her husband Bradlee Godshall served a notice of intent to sue under section 364 on Dr. Peterson. On July 28, 2022, the Godshalls filed an initial complaint against Dr. Peterson and the Orthopaedic Institute asserting claims for medical negligence, lack of informed consent, and loss of consortium. On December 20, 2023, the parties filed a stipulation for leave to file an amended complaint removing the lack of informed consent cause of action and the amended complaint was deemed filed the next day. The defendants filed their answer on December 28, 2023.

On July 1, 2024, Dr. Peterson and the Orthopaedic Institute filed a motion for summary judgment asserting the Godshalls' claims were barred by the statute of limitations under section 340.5. The Godshalls opposed the motion, arguing triable issues of material fact remained as to when the statute of limitations was triggered. After oral argument, the trial court issued its ruling finding the statute of limitations barred the Godshalls' claims and granting summary judgment in favor of Dr. Peterson and the Orthopaedic Institute. After the entry of judgment, the Godshalls appealed.

DISCUSSION

I

*Summary Judgment*

"The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843.) "[G]enerally, from commencement to conclusion, the party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Id*. at p. 850.) Thus, a defendant moving for summary judgment "bears the

5

burden of persuasion that 'one or more elements of' the 'cause of action' in question 'cannot be established,' or that 'there is a complete defense' thereto." (*Ibid.*, citing § 437c, subd. (o)(2).)

" 'Because this case comes before us after the trial court granted a motion for summary judgment, we take the facts from the record that was before the trial court when it ruled on that motion. [Citation.] " 'We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained.' " [Citation.] We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party.' " (*Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244, 1249–1250.)

II

*Statute of Limitations*

The statute of limitations for medical malpractice, set forth in section 340.5, states, "In an action for injury or death against a health care provider based upon such person's alleged professional negligence, the time for the commencement of action shall be three years after the date of injury or one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, whichever occurs first." "A plaintiff in a medical malpractice action must satisfy the requirements of both the one-year and the three-year limitations periods." (*Drexler v. Petersen* (2016) 4 Cal.App.5th 1181, 1189 (*Drexler*).)

The one-year limitations period does not begin to run until the plaintiff discovers both his or her injury and its negligent cause. (See *Gutierrez v. Mofid* (1985) 39 Cal.3d 892, 896 ["the term 'injury,' as used in section 340.5, means both a person's physical condition *and* its 'negligent cause' "]; *Sanchez*

6

*v. South Hoover Hospital* (1976) 18 Cal.3d 93, 99 ["the word 'injury' had come to be used in the cases to denote both 'a person's physical condition *and* its "negligent cause" ' "].) However, "[t]he plaintiff 'need not be aware of either the specific facts or the actual negligent cause of the injury. [Citation.] If the plaintiff has notice or information of circumstances that would put a reasonable person on inquiry notice, the limitation period is activated.' " (*Filosa v. Alagappan* (2020) 59 Cal.App.5th 772, 779 (*Filosa*).)

"The term 'injury' for purposes of section 340.5 ' "refer[s] to the damaging effect of the alleged wrongful act and not to the act itself." [Citation.] The injury is not necessarily the ultimate harm suffered, but instead occurs at "the point at which 'appreciable harm' [is] first manifested." ' [Citation.] An injury manifests when damage is 'evidenced in some significant fashion; when the damage has clearly surfaced and is noticeable.' " (*Filosa, supra*, 59 Cal.App.5th at p. 779.) Because the "limitations period accrues at the time of injury, it is the surfacing of appreciable harm that marks the beginning of the" period. (*Ibid.*)

"In sum, an action is barred under section 340.5 if it is brought *either* more than three years after an injury *or* more than one year after the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, the injury and its negligent cause." (*Filosa, supra*, 59 Cal.App.5th at p. 781.)

Identifying "both the injury and its cause" creates a challenge "when a doctor fails to diagnose or treat a preexisting condition: 'Where a claim of medical malpractice is based on the failure to diagnose or treat a pre-existing condition, the injury is not the mere undetected existence of the medical problem at the time the physician failed to diagnose or treat the patient or the mere continuance of that same undiagnosed problem in substantially the

7

same state. Rather, the injury is the *development* of the problem into a more serious condition which poses greater danger to the patient or which requires more extensive treatment.' " (*Drexler, supra*, 4 Cal.App.5th at p. 1193.)

" 'In this type of case, it is only when the patient becomes aware or through the exercise of reasonable diligence should have become aware of the development of a pre-existing problem into a more serious condition that his cause of action can be said to have accrued for purposes of' " section 340.5. (*Drexler, supra*, 4 Cal.App.5th at pp. 1193–1194; see also *Mason v. Marriage & Family Center* (1991) 228 Cal.App.3d 537, 542 (*Mason*) [" 'Until the patient "suffers appreciable harm" as a consequence of the alleged act of malpractice, he cannot establish a cause of action. " 'It follows that the statute of limitations does not begin to run against a negligence action until some damage has occurred.' " ' "].)

Critically here, " ' "[t]he mere fact that [a medical] operation does not produce hoped-for results does not signify negligence and will not cause commencement of the statutory period." ' [Citation.] Rather, '[w]hen there has been a belated discovery of the cause of action, the issue whether the plaintiff exercised reasonable diligence is a question of fact for the court or jury to decide. The drastic remedy of summary judgment may not be granted unless reasonable minds can draw only one conclusion from the evidence.' " (*Kernan v. Regents of University of California* (2022) 83 Cal.App.5th 675, 684 (*Kernan*).)

### III

### *Analysis*

In its order granting summary judgment, the trial court found it was undisputed that after the initial operation in 2017, Godshall "experienced physical manifestations of harm in her right wrist in the following months"

and this was "sufficient to trigger the three-year limitations period …, which expired well before plaintiffs filed their complaint." The court found *Filosa, supra*, 59 Cal.App.5th 772 and *Steingart v. White* (1988) 198 Cal.App.3d 406 (*Steingart*) were distinguishable because they involved latent or hidden medical conditions, and Godshall was "***not*** alleging that she was injured by Dr. Peterson's failure to diagnose a preexisting condition that later developed into a more serious problem. Rather, [Godshall] allege[d] that her injuries were caused by Dr. Peterson's negligent attempt to repair the carpal tunnel."

The trial court erred by looking solely to the time the injury was *caused* (i.e., the initial surgery), and not when Godshall became "aware or through the exercise of reasonable diligence should have become aware" that the operation was the source of her continued carpal tunnel syndrome. (*Drexler, supra*, 4 Cal.App.5th at pp. 1193–1194.) Contrary to the trial court's finding, this case is like a failure to diagnose case because the cause of the injury— the allegedly unsuccessful surgery—was latent until a later point. Because of this latency, a question of fact remains concerning when Godshall became, or reasonably should have become, aware that the operation was the cause of her continued symptoms and when those symptoms were sufficiently appreciable to constitute injury.

In her complaint, she asserts that Dr. Peterson negligently performed the carpal tunnel surgery, and it was not until "or about July of 2021 during a procedure that it was found that the median nerve was intact so, during the prior surgery by Defendants, the ligament was snipped instead of cut so it grew back and fused together." In essence, Godshall alleges Dr. Peterson negligently performed the surgery, negligently failed to diagnose the failed surgery, and she only became aware of the appreciable harm and its cause around the time of the revision surgery by Dr. Hofmeister. Put simply,

9

questions of material fact remain as to when the symptoms were sufficiently appreciable to constitute injury and when Godshall became aware that the cause of the injury was the prior surgery.

As Godshall argues, Dr. Peterson's statements to Godshall that the pain she continued to experience after the initial surgery was normal and that the surgery had been successful raise factual questions as to when she became aware that the surgery was the cause of her continued pain. As she states in her briefing before this court, Godshall alleges she was "injured by Dr. Peterson's failure to realize he had not completely severed the ligament … that later developed into a more serious problem because the ligament grew back and put more pressure on her menial [sic] nerve." When such harm became sufficiently appreciable to trigger the statute of limitations remains in dispute and is a question of fact for the jury. (See *Mason, supra,* 228 Cal.App.3d at p. 543 [reversing summary judgment where "nothing in the record … establishe[d] the date of [the plaintiff's] injury as a matter of law"].)

*Kernan, supra,* 83 Cal.App.5th 675 presents a helpful analogy. There, the pregnant plaintiff underwent an external cephalic version (ECV)—a procedure to rotate her fetus from a breech position to a headfirst position—at defendant's hospital in November 2016. (*Id.* at p. 678.) The plaintiff and her medical care providers believed the procedure was successful, but that evening the plaintiff did not detect any fetal movement and returned to the hospital the next day and delivered a stillborn fetus. (*Ibid.*) The plaintiff did not suspect negligence until the following July when the doctor who performed the procedure refused to review the autopsy with her and another doctor refused to answer questions about the fetal death. She filed a notice of

10

intent to sue in November 2017 and filed suit the following February. (*Id*. at p. 679.)

The trial court granted summary judgment, concluding that the date of injury triggering the one-year statute of limitations was the day the plaintiff learned of the fetal death, barring her complaint. (*Kernan, supra*, 83 Cal.App.5th at p. 679.) The Court of Appeal reversed, holding that a triable issue of fact remained as to when the plaintiff should have suspected the ECV was negligently performed: "The November 4, 2016 ECV initially appeared uncomplicated and successful. On November 5, 2016, plaintiff's doctors did not know the cause of the [fetal death], and as of November 6, 2016, they remained unaware of any association between ECV procedures and fetal demise. Given that medical professionals did not suspect wrongdoing, and given that defendant's autopsy report corroborates plaintiff's understanding that fetuses sometimes die in utero for unknown reasons, we cannot say that reasonable minds could draw only one conclusion—that plaintiff should have suspected defendant's wrongdoing on November 5, 2016." (*Id*. at p. 684.)

Like in *Kernan*, a question of fact remains as to when Godshall reasonably should have suspected her injury was a result of the operation performed by Dr. Peterson in 2017. Dr. Peterson argues that there is no dispute that Godshall and her husband were aware of the cause of her right-hand wrist pain in 2017 when Godshall "experienced persistent post-operative [wrist] pain and symptoms and when [her husband] experienced the deterioration of his marital relationship and loss of her household services." As noted, however, Dr. Peterson told Godshall her symptoms after the operation were normal and that she was healing fine. Further, the evidence at summary judgment showed Godshall did not understand her

11

continued pain was related to the initial operation until Dr. Hofmeister performed the carpal tunnel revision surgery in 2021 and discovered Dr. Peterson had failed to fully sever the ligament.[2]

---

[2]    *Steingart*, *Filosa*, and *Drexler* do not support affirmance of the court's decision.  In each of these cases, the cause of the injury was the physician's failure to diagnose a hidden, preexisting condition but the evidence at summary judgment did not conclusively establish the plaintiff was aware of the injury and its cause before the expiration of the statute of limitations.  In *Steingart*, the plaintiff discovered a lump in her breast in 1982 and the physician that examined her at that time diagnosed the condition as benign. (*Steingart, supra*, 198 Cal.App.3d at p. 409.)  Unsatisfied, the plaintiff visited a second doctor, who ordered a mammogram and also diagnosed the lump as benign.  (*Id*. at p. 410.)  Another mammogram in 1984 was also negative for cancer, but in 1985 the plaintiff noticed worrying changes in the lump and a fourth physician ordered a lumpectomy that showed she had stage II breast cancer.  (*Ibid*.)  In 1986, the plaintiff sued the first three doctors, and the trial court granted summary judgment, concluding the statute of limitations was triggered when the plaintiff first noticed the lump in 1982.  (*Id*. at p. 414.)  The Court of Appeal reversed, holding triable issues of material fact existed "as to whether [the plaintiff] exercised reasonable diligence after the purported misdiagnosis.  Reasonable minds could easily conclude [the plaintiff] did everything within her power to ascertain what, if any, illnesses she had after receiving [the first doctor's] initial diagnosis."  (*Id*. at p. 416.)

In *Drexler*, the plaintiff had various symptoms over several years that were eventually revealed to be caused by a brain tumor.  Drexler sued two physicians that had treated him but had failed to diagnose the tumor.  The trial court granted summary judgment, concluding "the one-year statute of limitations barred Drexler's medical malpractice claim … because Drexler had a suspicion of wrongdoing … when he ordered his medical records and consulted an attorney."  (*Drexler, supra*, 4 Cal.App.5th at p. 1188.)  On appeal, the court reversed, holding that disputed issues of material fact remained regarding when Drexler was put on notice that his symptoms were so severe that he needed further medical intervention.  (*Id*. at p. 1184.)

These facts establish the existence of a dispute both as to when the actual injury arose and when Godshall understood that her continued pain and the need for the second surgery was the result of the first surgery. Therefore, triable issues of material fact remain as to when the statute of limitations was triggered, and summary judgment was not properly granted.[3]

---

Likewise, in *Filosa*, the plaintiff complained for years to multiple physicians about severe headaches and other symptoms that were later revealed to be caused by a brain tumor. On appeal from summary judgment in which the trial court found the medical negligence claims were barred by section 340.5, the appellate court held that the "undisputed facts d[id] not establish that Filosa was on notice of his injury and should have discovered it and its negligent cause [the failure to diagnose], through the exercise of reasonable diligence, more than a year before he filed his complaint." (*Filosa, supra*, 59 Cal.App.5th at p. 784.)

In each of these cases, like the present case, there was no evidence that conclusively established for purposes of summary judgment that the plaintiff was aware of the injury and its cause more than one year before filing suit.

[3] The parties agree that the claims against the Orthopaedic Institute and the loss of consortium claim are derivative of the medical negligence claim. Accordingly, these claims must also be reinstated.

## DISPOSITION

The judgment is reversed.  Appellants are awarded the costs of appeal.

McCONNELL, P. J.

WE CONCUR:

O'ROURKE, J.

DO, J.

14

Filed 8/11/26

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| CECILIA GODSHALL et al., Plaintiffs and Appellants, v. DREW A. PETERSON et al., Defendants and Respondents. | D086572 (Super. Ct. No. 37-2022-00029915-CU-MM-CTL) ORDER CERTIFYING OPINION FOR PUBLICATION |

THE COURT:

The opinion in this case filed July 20, 2026 was not certified for publication.  It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request pursuant to rule 8.1120(a) for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page one of said opinion be deleted and the opinion herein be published in the Official Reports.

MCCONNELL, P. J.

Copies to:  All parties